LOCAL UNION No. 313, HOTEL & RESTAURANT EMPLOYEES,
ETC., v. STATHAKIS.

## Opinion delivered July 1, 1918.

1. LABOR UNIONS—RIGHT OF ORGANIZATION—RIGHT TO STRIKE—RIGHT OF CONDUCT TOWARD PUBLIC.—Laborers have the right to organize into unions for the purpose of bargaining collectively for the betterment of their condition, and, as an incident thereto to strike collectively. They may say for whom and upon what terms they will work, and may act through their unions in the decision of these questions, provided no contracts of employment are broken. And when they fail to agree with any employer and have gone upon a strike, they may apprise the public of that fact, and may solicit the support, not only of members of the union, but of the public generally, in any legitimate attempt to prevail in their controversy. On the other hand, labor unions have no right to resort to force, intimidation or coercion; publicity as well as other means of persuasion may be used, but force, intimidation and coercion may not be used.

2. LABOR UNIONS—PICKETING—PLACARDS.—Striking laborers may inscribe their grievances upon placards to be seen at a distance and to be read by many at the same time, provided the inscriptions are not libelous or otherwise unlawful, but any conduct on the part of pickets which amounts to coercion is unlawful and will be enjoined.

3. LABOR UNIONS—STRIKES—PUBLICITY—PICKETING.—While a labor union, on strike, may give publicity to that fact, and solicit support in its behalf, it has no right, in doing so, to disregard the equal rights of the employer to employ whom he pleases, provided he violates no contract right of employment, and so that the public may bestow its favor and support upon one side or the other free from any coercive molestation. The right to exhibit placards does not give the right to patrol or picket an employer's place of business with the placards so as to interfere with his lawful business.

4. INJUNCTION—PROTECTION OF RIGHT TO CARRY ON BUSINESS.—The right to carry on a lawful business without obstruction is a property right, and one which the courts have never hesitated to protect, and its protection is a proper object for the granting of an injunction.

5. LABOR UNIONS—PICKETING—USE OF PLACARDS—INJUNCTION.—Appellee, a restaurant proprietor, fell into a dispute with a certain labor union, whereupon employees of appellee, members of the union went on strike, and the local union covering laborers of that sort, viz., cooks and waiters and other restaurant employees, undertook to picket appellee's place of business with placards, stat-

ing that appellee was "unfair to union labor," and other legends. *Held*, under the proof that the pickets in exhibiting their placards were not merely notifying the public of their grievance, but were actually engaged in acts of intimidation and coercion, and that an injunction restraining them from picketing appellee's place of business was properly issued.

Appeal from Pulaski Chancery Court; *Jno. E. Martineau*, Chancellor; affirmed.

*Mehaffy, Reid, Donham & Mehaffy*, for appellant.

No force, violence, threats nor intimidations were used. The "picketing" was peaceful and not unlawful. It was error to grant the injunction. 50 L. R. A. (N. S.) 412; 109 S. W. 30; 96 Ark. 618; 162 S. W. 652; 161 N. W. 523; 100 N. Y. S. 292; 16 R. C. L. 454-7; 164 N. Y. S. 522; 159 Fed. 500; 171 Pac. 121; 197 Fed. 221; 163 Pac. 107; 62 S. E. 236; 166 Fed. 45; 238 Fed. 728; 78 N. Y. S. 860; 117 N. E. 582. The charge is not sustained by the proof and the injunction is too broad.

*Moore, Smith, Moore & Trieber*, for appellee.

1. The picketing was unlawful and the injunction properly granted. 16 R. C. L. par. 33 and notes; 139 Fed. 582; 120 *Id.* 121; No. 748 Ct. Civ. App. Tex. Apl. 20, 1918; 232 Ill. 424; 57 N. E. 1011; 83 *Id.* 940; 214 Pa. St. 348; 16 R. C. L. 16.

2. Large crowds gathered; the sidewalks were crowded and free travel impeded. Stink balls were thrown; employees were threatened and other unlawful acts committed. Plaintiff's business was interfered with and his customers disturbed and patronage lessened. Many unlawful acts were committed tending to excite passion and violence. 156 Cal. 170; 110 Fed. 698; 159 *Id.* 500; 3 Elliott on Roads & Streets (3 ed. par. 500; 11 Barb. (N. Y.) 390; 120 Fed. 215; 47 N. E. 630; 90 Ark. 574; Freund, Police Power, par. 168; 8 Pa. Sup. Ct. 130; 128 Mich. 545; 194 N. Y. 19; 33 N. E. 651; 145 Mass. 384; 90 Fed. 608; 4 Sandf. (N. Y.) 357; 44 N. E. 1077; 139 Fed. 583; 83 N. E. 940; 72 N. J. Eq. 653; 77 *Id.* 219; 39 Wash. 531; 77 N. W. 13; 24 Cyc. 834; 166 Pac. 665-7, 671; 245 U. S. 229, and many others.

SMITH, J.   Appellee operates two cafes in the City
of Little Rock, one of which is located at 104 ¡West Mark-
ham Street and is known as Faust cafe; the other is
located at 106 South Main Street and is known as Faust
Coffee House.   These cafes are located near the corner
of Main and Markham Streets and are about one block
apart.   In the operation of this business appellee em-
ployed from seventy to eighty cooks, waiters and helpers,
and a disagreement arose between him and his help.   It
is unnecessary to consider the merits of this disagree-
ment, but it eventuated in a demand on the part of his
employees that appellee unionize his cafes.   This de-
mand was refused, and the refusal was followed by a
strike, which was participated in by most of the em-
ployees.   This strike was conducted by the officers and
employees of Local Union No. 313 of the Hotel and Res-
taurant Employees' International Union, which is a vol-
untary association of cooks and waiters and waitresses
of the City of Little Rock.   As an incident to the strike
and in aid of it the Local Union ordered that appellee's
places be "picketed."  This consisted in having "pickets"
patrol the sidewalks in front of the entrances to the
cafes exhibiting large placards with the statements
printed thereon in large red type that "This cafe is un-
fair to union labor," and "Look, Faust Cafe is unfair to
union labor."   One person, and occasionally two, walked
continually in front of each of these cafes carrying plac-
ards, and at meal times this number was sometimes in-
creased.

The picketing continued for about a month, when suit
was brought against the officers of the local union and
certain of the pickets to enjoin them from further picket-
ing appellee's places of business.   The officers of the
union admitted that they employed the pickets and paid
them and had supervision over them and had represen-
tatives whose business it was to make regular inspec-
tions to see that the picketing was continuously carried
on.   Other restaurants and cafes in Little Rock which
refused to unionize were being picketed at the same time.

The demand that the restaurants should unionize meant that they should employ only persons who were members of the labor union. The officers of the union testified that they gave strict directions to the pickets to preserve order, to speak only when spoken to, and then only to answer respectfully questions asked them, and to keep walking the beats assigned them. These beats represented the fronts of the places of business which were being picketed. A number of the pickets testified that they obeyed these directions strictly and in doing so endured insults, derision and abuse in silence, and without resentment. No picket admitted having violated the instructions of the union which employed them.

On the other hand, there was testimony tending to show that such was not the case. Without naming the witnesses, it may be said there was testimony to the following effect. A prospective customer was accosted by one of the pickets, who said, "Don't go in there, brother; it's a scab joint." He disregarded the warning and entered. While eating, a lady and two children undertook to enter. She opened the door, when the picket said, "Don't go in there, lady; it's a scab joint; it's unfair to union labor." She stopped, hesitated, appeared worried, and then turned and went away. Pickets accosted many persons about to enter the cafes, a number of whom turned away and did not enter. A picket said to one of these, "I know his line of business and will remember it." A picket was heard to say, "I would like to get a chance to wait on some of those scabs eating in there." Frequently cooks and waiters who were on a strike at other restaurants joined the pickets and occasionally crowds gathered about the cafes and interfered with the free passage of customers, and the assistance of the police became necessary to clear away the crowds. Persons about to enter were seized by the arm and asked not to enter. Strikers had in some instances threatened employees with personal violence who refused to join the union. A waitress was told that if she did not join the union before the strike was won the house would have

to turn her out when it was forced to recognize the union; but she refused to join the union and continued at work. Pickets inserted the placards in the faces of a number of persons who indicated an intention to enter the cafes, and many were thus deterred from entering. Stink balls were thrown in the cafes while meals were being served. And as a result of the conduct detailed above appellee sustained a loss of business in one month of twenty-eight hundred dollars.

It is very probable that the pickets were not responsible for all this misconduct. Much of it was no doubt attributable to their sympathizers. But if the witnesses for appellee are to be credited the pickets were responsible for numerous acts of coercion and intimidation. And if this be true the officers of the union who employed these pickets must be held responsible for this misconduct, although they, not only did not direct the misconduct, but gave instructions to the contrary; for the misconduct occurred in the discharge of the duties for which the pickets had been employed and in the course of their employment as such. *Bryeans* v. *Chicago Mill & Lumber Co.,* 132 Ark. 282; *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229.

The court entered the following decree:

"* * * * that the defendants, and the agents and employees of each of the defendants, be and they are each restrained and enjoined while on, adjacent or near plaintiff's premises * * * from interfering with plaintiff's business, his customers, prospective customers or employees, and from picketing or patrolling, or causing to be picketed or patrolled the sidewalks or streets adjacent to plaintiff's said premises with placards designating said places of business as unfair to union labor or with placards otherwise so worded as to give said places such designation; and also that the defendants and the agents and employees of each of the defendants be and they are each restrained and enjoined from accosting or detaining or causing to be accosted or detained on the sidewalks or streets adjacent to plaintiff's

premises any person or persons seeking to enter plaintiff's restaurants for the purposes of dissuading them from patronizing or working for plaintiff, or from calling their attention to any alleged unfairness of plaintiff's restaurants to union labor or otherwise undertaking to influence such employees or prospective patrons from entering the service of or patronizing plaintiff's restaurants.''

(1)   Certain fundamental rights are recognized by each of the parties to this litigation as belonging to the other.   It is recognized, and this court has expressly decided, that laborers have the right to organize into unions for the purpose of barganing collectively for the betterment of their condition and, as an incident thereto, to strike collectively.   *Meier* v. *Speer,* 96 Ark. 618.   They have the right to say for whom and upon what terms they will work, and may act through their unions in the decision of these questions, provided, of course, no contracts of employment are broken.   And when they fail, acting thus collectively, to agree with any employer and have gone upon a strike, they have the right to apprise the public of that fact and to solicit the support, not only of members of the union, but of the public generally in any legitimate attempt to prevail in their controversy. Against the law as thus stated there appears to be no dissent.   On the other hand, it is equally as well settled and as uniformly held by the courts that the labor unions have no right to resort to force, intimidation or coercion. Publicity as well as other means of persuasion may be used; but force, coercion and intimidation may not be used.

Picketing as an aid to industrial strikes is somewhat of an innovation in the economic life of the nation and the law on the subject is in the formative period. It is a question of first impression in this State and a number of other States, like this one, have no cases on the subject.   However, there are a number of cases on the subject in both State and Federal Courts, but these courts are not in harmony on the subject.

(2)    Early cases upholding the right of picketing likened that action to the exercise of the right of free speech. This was upon the theory that as a striker might tell an individual citizen his grievance and thereby appeal to him for support in his strike, so he might employ any lawful and proper means which gave the greatest effect to that right and that he might, therefore, inscribe his grievances upon placards to be seen at a distance and to be read by many at the same time, provided the inscription was not libelous or otherwise unlawful. The existence of this right is still generally conceded, and we think such right exists. But it appears in the history of this movement as reflected in the opinions of the courts on the subject that there has been an extension of the rights claimed by the labor unions in this respect, and the differences which appear in the decisions of the courts largely arise out of contrariety of view as to when the assertion of this right by the labor union to give notice of its grievances becomes an infringement on the rights of others by coercing those others into compliance with the demands of organized labor, or, as has been stated, the cases all agree in holding that any conduct on the part of the pickets which amounts to coercion is unlawful and will be enjoined.

(3)    But as the cases continued to come before the courts and the law on the subject to be molded, it became more and more apparent that picketing was practiced and resorted to, not alone for purposes of publicity and persuasion, but for coercion and intimidation as well; so that, while the tendency of the earlier cases was to uphold picketing as an exercise of the right of free speech, the tendency of later cases is to restrict that right as an act of coercion in its tendencies, and one which in its practical application tends generally to breaches of the peace and other disorders. This fact is recognized and stated by the author of the note to the annotated cases of *In Re Langell,* 50 L. R. A. (N. S.) 412. The modern and better view on the subject appears to be that, while the labor union which is on a strike has the right to give

publicity to that fact and to solicit support in its behalf, it has no right, in doing so, to disregard the equal right of the employer to employ whom he pleases, provided he violates no contract right of employment, and that the public may bestow its favor and support upon one side or.the other free from any coercive molestation.

(4)   The labor union or its representatives and employees had the right to exhibit the placards in question to the public; but it is a far different thing to say that the right to exhibit these placards to the public carried with it the right to so patrol or picket appellee's places of business with these placards as to interfere with his lawful business.   The cases all agree that the right to carry on a lawful business without obstruction is a property right, and one which the courts have never hesitated to protect, and its protection is a proper object for the granting of an injunction.

(5)   The placard itself may be lawful and its display, therefore, not unlawful; yet, with the use of such a placard, or, for that matter, without the use of any placard, one's right to prosecute his own lawful business may be unnecessarily interfered with.   The legality of the inscription on the placard, and the right to display such a placard, did not give one the right to make any use he pleases of the placard.   It is commonly said that one may do as he pleases with his own; but that is not an exact statement of the law.   He can not so use his own as to inflict unnecessary injury upon another. This truth is so just and so apparent that early in the history of our law the maxim grew up, *"Sic utere tuo ut alienum non laedas."*   This maxim was quoted and translated by Mr. Justice Pitney in the case of *Hitchman Coal & Coke Co., supra,* where it was said:

The familiar maxim, *'Sic utere tuo ut alienum non laedas'* literally translated, 'So use your own property as not to injure that of another person,' but by more proper interpretation, 'so as not to injure the *rights* of another' (Broom, Legal Maxims, 8th ed. 289) applies to conflicting rights of every description.   For example,

where two or more persons are entitled to use the same road or passage, each one, in using it, is under a duty to exercise care not to interfere with its use by the others, or to damage them while they are using it.''

This quotation was used in the case cited in a discussion of the relative rights of the employer and the employee, wherein the right of the employer was upheld to discharge the employee for joining a labor union. In that case, as in an infinite number of others, it was recognized that rights are reciprocal, and so are duties. For the occasion may arise when rights are conflicting. I have the right to use the sidewalk and any portion thereof and at all hours, subject to necessary police regulations. But so has my neighbor. My right qualifies his; and his right qualifies mine; so that each must exercise his right in a manner not to interfere unnecessarily with the rights of the other. So here the strikers and the union to which they belonged, and the employees thereof, had the right to give notice to the public that appellee's cafes were open shops, and therefore unfair to union labor; but, in doing this, they had no right to exercise coercion resulting from the conduct herein set forth. They were not using the streets in front of appellee's place of business for the ordinary purposes for which streets and sidewalks are intended, but were using them for the avowed purpose of injuring his business, or driving away the patronage which the public might otherwise have given him. Their interference with his business was direct and immediate and was intended so to be.

The conduct of the pickets was manifestly not intended merely to give notice to the public that appellee's cafes were unfair to union labor. The area in which the pickets confined their operation is evidence that such alone was not their intention, as their beat was limited to the frontage of appellee's cafes on the streets. Not many, if any, patrons could enter without being observed, and these would know that they had been observed. The number of pickets was increased at the meal hours when a larger number of people were likely

to enter the cafes for their meals. And can there be any real question as to the meaning of the presence of the pickets? Were they not doing something more than giving notice to the public that they had an undecided issue with the business which they were picketing? Were they not saying, even though it was silently said, "See what we are doing to this man, because he has incurred our displeasure? Beware a similar fate!" And was it not necessarily true that many people who had no knowledge or opinion in regard to the existing controversy, and who felt no interest in the terms of its final settlement, were deterred from according the patronage which might otherwise have been given appellee simply because there was a controversy in which they did not desire to even appear to be parties?

In discussing a similar question in the case of *Jones* v. *VanWinkle Gin & M. Works,* 17 L. R. A. (N. S.) 848, the Supreme Court of Georgia said that conduct which operates upon one's fears rather than upon his judgment or his sympathy is coercive.

In the case of *Pierce* v. *Stablemen's Union,* 156 Cal. 70, 103 Pac. 324, the Supreme Court of California said: "It (picketing) tends, and is designed, to drive business away from the boycotted place, not by the legitimate methods of persuasion, but by the illegitimate means of physical intimidation and fear. Crowds naturally collect; disturbances of the peace are always imminent and of frequent occurrence. Many peaceful citizens, men and women, are always deterred by physical trepidation from entering places of business, so under a boycott patrol. It is idle to split hairs upon so plain a proposition, and to say that the picket may consist of nothing more than a single individual, peacefully endeavoring by persuasion to prevent customers from entering the boycotted place. The plain facts are always at variance with such refinements of reason."

This question is discussed in Eddy on Combinations, volume 1, section 539, where it is said: "A picket is the agent of a combination, and the legality or illegality of

the maintenance of a picket has absolutely nothing to do with the number of pickets employed, but depends upon the objects of the combination and the means used by the picket to attain the objects.  If the object of the combination is simply to notify parties seeking employment that a strike is on, and to persuade them by peaceful and lawful arguments not to take the places of the striking workmen, then the picket is not illegal, and it is quite immaterial whether there be one picket or many.  If, however, the object of the combination in maintaining the picket is to intimidate other workmen and thereby prevent their finding employment, the picket is illegal, whether there be one or many.

"In determining the object of the combination the courts will probe deeper than resolutions and mere professions of good will and lawful intentions.  It unfortunately happens that there is seldom a case where a picket is maintained that the members of the picket or their hangers-on do not resort to acts of violence, and to jeers, cries, epithets and threats calculated and intended to intimidate workmen who are not members of the combination.  So true is this that the very term 'picket' has come to mean in the popular mind threats, violence and intimidation.  It is conceivable, however, that a picket entirely lawful might be established about a factory, but such a picket would go no further than interviews and lawful persuasion and inducement.  The slightest evidence of threats, violence or intimidation of any character ought to be sufficient to convince court and jury of the unlawful character of the picket, since the picket under the most favorable consideration means an interference between employer seeking employees and men seeking employment."

The decree enjoins picketing at and near appellee's premises and the operation of the injunction is limited to that immediate vicinity.  The reason for the limitation is manifest.  A presentation of labor's grievances elsewhere gives the member of the public whose support is thus solicited an opportunity for reflection; but when

the picketing is conducted in the small space of the frontage of the business picketed the effect of that conduct is practically immediate. No opportunity for reflection is afforded. One must choose immediately between defying the picket and acceding to his appeal; so that interference necessarily results to the business there being conducted. We conclude, therefore, that the decree of the court enjoining the picketing under the conditions stated is right and proper and should be affirmed.

We have not attempted to collect or cite the numerous cases on this subject. A number of these cases are cited in the excellent briefs of respective counsel, and while it is true as stated above that all of these cases do not support the views which we have here expressed, we are of the opinion that our views are in accord with the better reasoned cases and the soundest principles of natural justice. The following cases on the subject are annotated and present the different views of the courts, and, in addition, collect and cite most of the cases on the subject, and reference is made to these cases for the use of any one who may wish to pursue his inquiry further: *Goldberg* v. *Stablemen's Union,* 9 Ann. Cas. 1219, 8 L. R. A. (N. S.), 460; *Vegelahn* v. *Guntner,* 57 A. S. R. 443, 35 L. R. A. 722; *Iron Moulders' Union* v. *Allis- Chambers Co.,* 20 L. R. A. (N. S.), 315; *Karges Furniture Co.* v. *Amalgamated Woodworkers' Union,* 6 Ann. Cas. 829; *Everett Waddey Co.* v. *Richmond Typo. Union,* 8 Ann. Cas. 798, 5 L. R. A. (N. S.), 792; *St. Louis* v. *Gloner,* 124 A. S. R. 750, 15 L. R. A. (N. S.), 973; *Barnes* v. *Chicago Typo. Union,* 122 A. S. R. 129; *Beck* v. *Railway Teamsters' Protective Union,* 42 L. R. A. 407, 74 A. S. R. 421; *Jensen* v. *Cooks' & Waiters' Union,* 4 L. R. A. (N. S.), 302; *George Jonas Glass Co.* v. *Glass Bottle Blowers' Assn.,* 41 L. R. A. (N. S.), 445; *St. Germain* v. *Bakery & C. Workers Int. Union,* L. R. A. 1917 F 824.

HART, J., (dissenting). There is no difference in judicial opinions in respect to the illegality in the use of any act which is calculated to coerce. The difference of judicial opinions arises in respect to what acts should be

regarded as coercive. The decision of this question must depend, to a large extent, upon the circumstances surrounding each particular case. I do not think that the law is, that picketing in itself, without some other act tending to show coercion, is subject to injunctive relief. There must be taken into account the number of picketers, the extent of their occupation of the sidewalk, or street adjacent to the building or place picketed, and as well what they say and do and how they act. If the purpose of picketing is to interfere with those going into or coming out of the building, or place picketed, an injunction may be granted. On the other hand, if the design of the picketing is merely to give notice to the public that the proprietor of the place picketed is unfair to union labor, or to see who can be made the subject of persuasive argument, such picketing is legal and ought not to be enjoined.

Judge HUMPHREYS concurs with me in this dissent.